IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES FIELDS, | ) | CASE NO.  1:08 CV 1610 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff James Fields' application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 et seq., is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I.  PROCEDURAL HISTORY

On July 15, 2003, Plaintiff filed an initial application for Disability Insurance Benefits and Supplemental Security Income, claiming an onset date of June 2, 2003 (Tr. 71-73, 136-138). Plaintiff met the insured status requirement through June 30, 2005 (Tr. 37).  Administrative Law Judge ("ALJ") Rita S. Eppler held a hearing on March 16, 2006, and issued a final opinion on January 24, 2007, finding Plaintiff had severe impairments described as: (1) minimal intervertebral

1

disc disease at L4-5; (2) minimal facet arthropathy at L4-5 and L5-S1; (3) low back pain; and (4) a history of polysubstance abuse (both alcohol and cocaine) in current questionable remission (Id.). The ALJ found, however, that Plaintiff's mental and physical residual functional capacity ("RFC") permit Plaintiff to perform his past relevant work as a stores laborer/warehouse worker, construction worker II, and parts washer, and therefore, Plaintiff is not disabled (Tr. 38- 39).  The Appeals council denied Plaintiff's request for review of the ALJ decision on May 8, 2008, and Plaintiff timely  filed an action for judicial review pursuant to 42 U.S.C.§405(g) (Tr. 4).  Plaintiff alleges the ALJ: (1) erred in not finding major depression and personality disorder to be severe impairments; (2) failed to properly weigh the opinion of Dr. Schonberg, an examining physician; and (3) failed to address the record as a whole by ignoring evidence consistent with a finding of disability[1].

## II. <u>EVIDENCE</u>

### A. Personal and Vocational Evidence

Plaintiff was born on April 9, 1969, making him 37 years old at the time of the ALJ's determination and a  "younger individual."  *See* 20 C.F.R. §§404.1563, 416. 963. (Tr. 38).  He completed school through the 8th grade, and later obtained a GED while serving in the military from October 1986 to November 1987 (Tr. 135, 263).   Plaintiff has held approximately 30 jobs, most involving work with machinery.   Plaintiff's criminal record contains about 30 misdemeanors including public intoxication, disorderly conduct, domestic violence, and DUI.  In addition, Plaintiff was arrested in 1991 for trafficking cocaine (Tr. 188).

---

[1]  Plaintiff presents his assignment of errors as two issues, but for ease of analysis the Court presents them as three issues.

### B.  Medical Evidence

In September 2002, Plaintiff began receiving treatment from Allen H. Harris, M.D. for a lower back injury.  Dr. Harris prescribed Xanax, Percocet, and other medication.  As of June 2003, Plaintiff had no cognitive difficulty (Tr. 175-183).

On December 19, 2002 Plaintiff arrived at the emergency room, bleeding from a self-inflicted wound to his left wrist.  Plaintiff's blood alcohol concentration measured 0.23, and he also tested positive for cocaine and benzodiazepines.  Plaintiff acted abusively toward hospital staff, and expressed suicidal and homicidal ideation, which led to a psychiatric screening of Plaintiff (Tr. 150, 156, 151).

A social worker performed an initial screening of Plaintiff on December 19, 2002.  Plaintiff's memory was assessed as being recently impaired, and his appearance was disheveled (Tr. 168).  In addition, Plaintiff's mood and affect were angry, depressed, anxious, and included suicidal thoughts (Id.).  Plaintiff reported past substance abuse including: cocaine, alcohol, acid, crack, heroin, and PCP (Tr. 171).  He completed regular classes in school until he was kicked out for fighting and using drugs  (Id.).  Plaintiff also reported that he was charged with domestic violence in the past, and had an upcoming court date regarding his city taxes (Tr. 170).  The social worker diagnosed Plaintiff with dysthymic disorder and polysubstance abuse, as well as a Global Assessment of Functioning ("GAF") score of 50 (Tr. 172).  The social worker recommended Plaintiff be admitted to the hospital for a three day stay.

Later that same day, Stuart Oppenheimer, M.D. evaluated Plaintiff.  Plaintiff denied depression, as well as having suicidal thoughts, claiming if he were sober he "wouldn't have done it" (Tr. 153).  Dr. Oppenheimer assessed a GAF score of 55 and diagnosed Plaintiff with the

3

following: alcohol dependence (continuous), narcotic abuse, and mixed personality disorder not otherwise specified  (Id.).  In addition, Dr. Oppenheimer discharged Plaintiff that same day, after notifying the police as Plaintiff had warrants out for his arrest (Tr. 154).

November 5, 2003, William B. Schonberg, Ph.D. evaluated Plaintiff, as requested by the Bureau of Disability Determination, with Plaintiff serving as the sole informant (Tr. 187).  Plaintiff reported that he was abused by his father and expelled from school after setting fire to a student's hair  (Id.).  Dr. Schonberg noted that Plaintiff had been a daily drinker, consuming two fifths or more of alcohol per day, up until 2002 (Tr. 188).  Also, Plaintiff used cocaine amounting to a $300 per day habit from 1987 until eight months before the exam (Id.).  Dr. Schonberg reported that Plaintiff made three suicide attempts, including two overdoses and one in which Plaintiff cut his own wrists  (Id.).  In addition, Dr. Schonberg noted Plaintiff's criminal record of approximately thirty misdemeanors (Id.).

Plaintiff told Dr. Schonberg that he experiences suicidal thoughts on a daily basis (Tr. 189).  Plaintiff also reported that he suffers from anxiety attacks up to five times per week, occurring for the past three years  (Id.).  Plaintiff expressed feeling hopeless, helpless, and worthless  (Id.).  In addition, when depressed, Plaintiff described having no energy and not wanting to be around other people  (Id.).  Plaintiff stated that he often becomes angry and hostile  (Id.).

Dr. Schonberg assessed Plaintiff as having cognitive functioning in the low-average range, with limited common sense and judgment to live alone (Tr. 190).  Plaintiff's diagnosis included: alcoholism (continuous), cocaine dependancy (in early sustained remission), dysthymic disorder, and personality disorder with anti-social, dependant, and avoidant features (Id.).  Dr. Schonberg diagnosed a functional GAF of 55, a symptomatic GAF of 60, and an overall GAF of 50 (Tr. 190-

4

191).

Dr. Schonberg opined that Plaintiff was moderately to severely impaired in his ability to relate to others, including fellow workers and supervisors, because of his personality disorder (Tr. 191).  Dr. Schonberg also concluded that Plaintiff was capable of comprehending and completing simple, routine tasks at home and in the community (Id.).  A chemical dependency and low-average intellectual function mildly to moderately impaired Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks (Id.). Dr. Schonberg assessed Plaintiff's ability to withstand stress as being at least moderately to severely impaired due to his personality disorder, chemical dependency, and dysthymic disorder  (Id.).  In addition, due to Plaintiff's chemical dependency, Dr. Schonberg opined that Plaintiff did not have the mental ability to manage his own funds (Tr. 192).  Dr. Schonberg stated that, "overall, it is concluded that the claimant has the mental ability to perform at least simple repetitive work tasks but would likely have difficulty with coworkers and supervisors.  He would be labile, inconsistent, and demonstrate poor attendance and a low level of motivation" (Tr. 191).

Dr. Schonberg completed a mental functional capacity assessment of Plaintiff.  He noted marked limitations in Plaintiff's ability to do the following: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others (Tr. 193). The remainder of the functional assessments were found to be not significantly limiting or only moderately limiting (Id.). Dr. Schonberg concluded that Plaintiff was "unemployable," and his physical or mental limitations were expected to last between thirty days and nine months (Tr. 194).

On November 21, 2003, Guy G. Melvin, Ph.D reviewed the record and completed a psychiatric review technique (Tr. 195). Dr. Melvin diagnosed Plaintiff with: dysthymic disorder, personality disorder NOS, and etoh abuse (continuous), although Plaintiff did not meet or equal any listing (Tr. 195-196). Dr. Melvin concluded that Plaintiff's limitations mildly affected his daily activities and created moderate difficulties in maintaining social functioning and concentration, persistence, or pace (Tr. 199). Plaintiff had no episodes of decompensation (Id.).

Dr. Melvin also completed a mental residual functional capacity assessment, finding no marked limitations (Tr. 202-203). Dr. Melvin opined that Plaintiff was moderately limited in his ability to do the following: carry out detailed instructions; maintain attentions and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (Id.).

6

Dr. Melvin noted that Plaintiff was subject to "self-described panic attacks" (Tr. 204). Dr. Melvin concluded that Plaintiff was able to understand and remember simple work instructions, and sustain concentration and persisting in simple, routine work duties (Id.). In addition, Plaintiff could interact occasionally in situations that did not require resolving conflict or persuading others to follow demands, with minimal contact with coworkers and supervisors (Id.). Also, Plaintiff was capable of carrying out tasks where his duties were relatively static and changes could be explained, and did not require independent prioritization or more than daily planning (Id.). On February 13, 2004, Douglas J. Pawlarczyk, Ph.D reviewed and concurred with Dr. Melvin's psychiatric review technique and mental residual functional capacity assessment (Tr. 195, 203).

On April 2, 2004, Plaintiff began psychiatric treatment and had an initial evaluation by Jay D. Haar, M.D. (Tr. 240). Plaintiff stated that he was seeking treatment for his "mood swings, temper, and agitation" (Id.). Plaintiff mentioned often feeling violent and not being able to sleep (Tr. 240, 241). Dr. Haar diagnosed Plaintiff with bipolar disorder and assessed a GAF score of 65. Plaintiff had a follow up appointment with Chandu Patel, M.D. on May 4, 2004 (Tr. 237).

Dr. Patel noted that Plaintiff "was rather inconsistent in providing information and often contradicted his own statements" (Id.). In addition, Dr. Patel noted that Plaintiff had applied for Social Security Disability benefits, but that his application was denied because Plaintiff was not receiving treatment (Id.). Plaintiff complained about feeling depressed, restless sleep, and being upset due to issues in his life such as the fact that he was restricted in visitations with his three children (Id.). He was also upset because he had been living with various friends and family members for the past two to three years (Id.). Although Plaintiff claimed to have not used alcohol and cocaine for the past four or five years, Dr. Patel commented that a counselor previously noted

Plaintiff had been sober for two years (Id.).  Dr. Patel diagnosed Plaintiff with bipolar disorder, cluster A personalty, alcohol abuse (in remission by history), and cocaine abuse (in remission by history), and assessed a current GAF of 65 (Tr. 238).

Dr. Patel completed a mental functional capacity assessment on May 4, 2004 (Tr. 218).  In all the functional areas assessed, Dr. Patel found Plaintiff's most severe level of limitation at "not significantly limited" (Id.).  He also opined that Plaintiff was employable, and that the limitations were expected to last between thirty days and nine months (Tr. 219).

On June 3, 2004, Plaintiff began consistent treatment with Frances L. Swarn, M.D. (Tr. 235).  Plaintiff complained of depression, sleep disturbance, and anxiety, stating that he needed medication to "better control his mood" (Id.).  Plaintiff stated that stressors in his life included his unemployment and homeless status, as well as his children being up for adoption (Id.).  Plaintiff reported that he has panic attacks easily and hallucinations of "people walking and... calling my name," although none were present during the evaluation (Id.).  Plaintiff also stated that he had "been off drugs for quite a few years" (Id.).  Dr. Swarn noted that Plaintiff had poor attention and concentration, no delusions in his thought content, and no hallucinations (Tr. 236).  Dr. Swarn diagnosed Plaintiff with mood disorder, and ruled out bipolar disorder, primary anxiety disorder, and dysthymia (Id.).  In addition, Dr. Swarn diagnosed both alcohol and cocaine abuse in full remission, per history (Id.).  A GAF range was assessed between 55 and 65 (Id.).

Plaintiff next saw Dr. Swarn on August 2, 2004 (Tr. 232).  At this appointment, Plaintiff stated that he "feels things are going well" and "overall is doing well," although he did mention continued difficulty sleeping (Id.).  Plaintiff requested that Dr. Swarn send a letter to Children's Services stating that his medications were "under control" so that Plaintiff could pursue gaining

custody of his children (Id.). Plaintiff told Dr. Swarn he had been caring for the children for "three or four years now" (Id.).  Dr. Swarn noted "no evidence of panic attacks," even though Plaintiff had a slightly anxious mood (Id.).  Dr. Swarn diagnosed Plaintiff with major depressive disorder, recurrent, and ruled out primary anxiety disorder, per history.  In addition, both alcohol and cocaine abuse were found to be in full remission (Id.).  Dr. Swarn assessed a GAF score between 55 and 65 (Id.).

Dr. Swarn evaluated Plaintiff on September 13, 2004 and diagnosed major depressive disorder, recurrent, as well as both alcohol and cocaine abuse in full remission (Tr. 230).  A GAF range between 55 and 65 was made (Id.).  Plaintiff reported that he was cooperating with Children's Services by going to appointments to give drug samples, but that he was arrested after getting caught shoplifting (Id.).  Plaintiff also stated that working with Children's Services could be overwhelming, and that he sometimes had difficulty getting there due to transportation problems (Id.).

Dr. Swarn again evaluated Plaintiff on November 18, 2004 and made the same diagnosis and GAF score as September 13 (Tr. 228).  Plaintiff stated that he had temporary custody of two of his three children, and expected to gain full custody by December (Id.).  Plaintiff also commented that he was having some difficulty managing the two children as the nine-year-old had a seizure disorder, and the eight-year-old possibly suffered from attention deficit disorder (Id.).  Plaintiff stated that an appointment was scheduled for the eight year old to see a doctor (Id.).  Dr. Swarn noted that Plaintiff had poor attention and concentration, and Plaintiff complained of more breakthrough symptoms and sleep disturbances (Id.).

Plaintiff saw Dr. Swarn for the last time on January 10, 2005, although Dr. Swarn did recommend a follow-up appointment in the  treatment notes (Tr. 224).  Dr. Swarn made the same

diagnosis and GAF score as the September 13 and November 18 appointments (Id.).  Plaintiff stated that he continued to work regularly with Children's Services, and that he continued to have sleep disturbances (Id.).  Dr. Swarn noted that "patient does feel he is doing well" (Id.).

In July 2005, Plaintiff tested positive for cocaine, in violation of his parole (Tr. 243).  A counselor for The Center for Individual and Family Services, Inc. evaluated Plaintiff and determined that Plaintiff was not suicidal and did not need to be placed on suicide watch (Tr. 246).  Plaintiff admitted using cocaine four days prior and denied any suicidal thoughts (Tr. 243, 244).  The counselor noted that Plaintiff was slightly depressed, his affect blunted, and his intelligence as average (Tr. 243).  The counselor diagnosed Plaintiff with depressive disorder, cocaine abuse, antisocial personality disorder, and assessed a current GAF of 38 (Tr. 245).

On December 8, 2005, Plaintiff went to Family Life Counseling and Psychiatric Services for drug and alcohol assessment and treatment, after being referred by Richland County Children's Services (Tr. 251).  Plaintiff began a non-intensive, outpatient treatment on December 20, 2005 (Id.).  On February 8, 2006, Mary Johnson, a substance abuse counselor, stated in a letter to Plaintiff's attorney that Plaintiff had a "long history of polysubstance abuse history including alcohol, cocaine, and marijuana" (Id.).  Ms. Johnson also noted that Plaintiff had only missed one individual counseling session, completed all his required homework, and was making progress (Id.).  The letter also stated that Plaintiff tested positive for opiates on two different dates.  A letter dated March 7, 2006 explained, however, that Plaintiff's positive tests were likely caused by his prescription medication, and that Plaintiff did not appear to be "physically under the influence" of drugs (Tr. 250).

10

### C.  Vocational Expert Testimony

At the hearing, Vocational Expert ("VE") Carl Hartung testified that Plaintiff's past relevant work includes a stores laborer/warehouse worker (unskilled, medium), construction worker II (unskilled, medium), parts washer (unskilled, medium), and screw machine operator (semi-skilled, heavy) (Tr. 293-294).  When the VE considered Plaintiff's physical limitations and the psychological limitations identified by Dr. Patel, the VE found Plaintiff would still be able to perform his past relevant work as a stores laborer/warehouse worker, construction worker II, and parts washer (Tr. 295).  The VE also considered Plaintiff's physical limitations and the psychological limitations identified in Dr. Schonberg's narrative opinion and found that Plaintiff could perform his past relevant work as a stores laborer and construction worker (Tr. 296).  When asked by Plaintiff's attorney to consider Dr. Schonberg's "without any qualifications of what's in that exhibit, just as you perceive the exhibit," the VE stated that the opinion was "work prohibitive" (Tr. 297).  The VE stated that the Plaintiff could not perform any work, past or other jobs, if the ALJ found Plaintiff's testimony to be credible (Tr. 297).

Finally, Plaintiff's attorney asked the VE to consider Dr. Melvin's checkmarked mental residual functional capacity assessment and describe what type of work Plaintiff could perform.  The VE opined that Plaintiff would be unable to perform past work or other work, based on a moderate limitation to maintain regular attendance and be punctual, because "[i]f you can't maintain regular attendance and be punctual without any problems, that's going to jeopardize any employment" (Tr. 299).  The VE then was asked to consider only Dr. Melvin's narrative and the VE responded that Plaintiff would still be able to perform work as a stores laborer, construction worker, and parts

washer (Tr. 299).[2]

### D.  Plaintiff's Function Report and Hearing Testimony

In August 2003, Plaintiff completed a function report and stated that he lived with friends, prepares his own meals two to three times per week, and spends times with others "sometimes on phone and computer" for one to two hours per day (Tr. 97, 99, 101).  Plaintiff also stated that he had "no social life" and that he had problems getting along with anyone (Tr. 101).  Plaintiff said that he has lost a job because of problems getting along with people, and that he usually disagrees with most people (Tr. 103).  He reported problems paying attention and having trouble remembering things (Tr. 102-103).  Plaintiff also completed a symptoms report in August 2003 in which Plaintiff stated "I have panic attacks" that cause shortness of breath, depression, nervousness, and daily suicidal thoughts (Tr. 105).  He reported that these symptoms occur everyday, all day (Tr. 106-107).  Plaintiff stated that he takes Xanax and it helps "very much" but makes him feel "tired and groggy" (Tr. 107).

In March 2006, Plaintiff testified that his two sons lived in his apartment with him for ten months the previous year (Tr. 264).  The boys were removed from his home when Plaintiff had a positive drug test (Tr. 265).  Plaintiff then stated that he expected to get his children back the following day, as his weekly drug tests had all been negative, apart from his prescription medication (Tr. 265).  Plaintiff testified that he quit smoking three months before the hearing, and that he previously smoked half a pack a day for 24 years (Tr. 267).  He then stated that he no longer drank,

---

[2]After the ALJ's first question instructing the VE to look only at the mental functional capacity assessment, the record reflects the following:

    Q: And if I ask you to look at the narrative itself without [INAUDIBLE]
    A: Yes, it would.  I think that considering the narrative there it is still the ability to do the stores laborer, construction worker number II and the washer parts.

Based on the previous question and answer to the inaudible question, it is reasonable to infer that the inaudible portion instructed the VE to not consider the mental functional capacity assessment.

but he used to drink on the weekends "maybe between a six-pack and 12-pack in like an evening" (Tr. 267-268). Plaintiff stopped drinking in 2002, except for one relapse in 2004 when Plaintiff drank two or three beers (Tr. 268-269). Plaintiff also testified that he previously used cocaine once every two or three months (Tr. 269). He stated that he did not buy cocaine, but a friend "would give it to me and I would do it with them" (Tr. 269). Plaintiff reported that his cocaine use occurred for two or three years, ending in 2002 with one relapse in late 2004 or early 2005 (Tr. 269-270).

When asked about Dr. Schonberg's note that Plaintiff had been a daily drinker, Plaintiff responded "that must have been a misunderstanding" (Tr. 285). Plaintiff also testified that Dr. Schonberg misunderstood him when Dr. Schonberg recorded that Plaintiff used $300.00 worth of cocaine a day until eight months before the evaluation (Tr. 287). Plaintiff acknowledged that he had been arrested in 1991 for trafficking cocaine but also said he was not actually selling it (Tr. 287).

Plaintiff testified that he experiences anxiety attacks that began occurring on a daily basis in 2002 or 2003 (Tr. 281). He stated that the only people he is ever around are his sister and mother (Tr. 280). Plaintiff also reported that living with his two children had been hard, but his sister would help out and pick the kids up once or twice a week to give Plaintiff a break (Tr. 281-282).

### III.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance Benefits and Supplemental Security Income only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505(a), 416.905(a).

## IV.  **STANDARD OF REVIEW**

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*  Indeed, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  **ANALYSIS**

### A.  **Whether the ALJ Erred in not Finding Major Depression and Personality Disorder as Severe Impairments**

The ALJ recognized Plaintiff's physical limitations and polysubstance abuse (in current

14

questionable remission) as severe impairments, but she did not specifically recognize Plaintiff's major depressive disorder and antisocial personality disorder as severe impairments. Plaintiff argues the ALJ erred by not finding these impairments to be severe and by failing to consider the impairments in the RFC analysis. The Court concludes, however, that substantial evidence supports the ALJ's decision.

The issue of whether the ALJ erred by not finding depression and personality disorder as severe impairments is relevant only if the ALJ failed to consider all impairments at later steps of the analysis. *Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that the Secretary did not commit reversible error in failing to recognize a claimant's cervical condition as a severe impairment because the Secretary still considered the cervical condition in determining the RFC of the claimant). Once an ALJ determines the claimant has one severe impairment, the regulations require the ALJ to consider the limiting effects of all the claimant's severe and non-severe impairments. *Pompa v. Comm'r of Soc. Sec.*, 73 Fed. Appx. 801, 803 (6th Cir. 2003); 20 C.F.R. §404.1545(e).

In step two of the analysis, the ALJ found a combination of severe impairments, including a mental impairment of polysubstance abuse, but determined in step three that the impairments did not meet or equal a level of severity described in the Listings. The ALJ's decision suggests she did consider depression and personality disorder, in addition to polysubstance abuse, at later steps as required by the regulations. First, the ALJ thoroughly addressed the hearing testimony, discussing Plaintiff's "most significant problem"- i.e., self-described anxiety and depression - and the effects anxiety had on Plaintiff's ability to function (Tr. 21, 33). Second, the ALJ recounted each mental diagnosis made, including those which described Plaintiff's "depression" and/or "personality

disorder," and explicitly stated that all medical opinions were considered in determining Plaintiff's RFC (Tr. 22, 24-27, 31).  Third, the ALJ specifically stated in the section of her written decision entitled "Consideration of Claimant's Allegations" that "the severity of the claimant's mental *impairments* has been measured" using the 12B criteria (Tr. 33) (emphasis added).  The use of the plural "impairments" in this sentence suggests the ALJ considered Plaintiff's depression and personality disorder, in addition to his polysubstance abuse, since the ALJ did not refer to a single mental *impairment*.  Finally, the ALJ's decision suggests that she did not overlook Plaintiff's depression and personality disorder because she assessed the functional limitations of Plaintiff's impairments based on 12B criteria applicable to depression, personality disorder, and polysubstance abuse.

The ALJ's failure to recognize Plaintiff's diagnoses as a severe impairments is not grounds for remand because "disability is based on a Plaintiff's functional limitations, not on his or her diagnoses." *Sivels v. Astrue*, 2009 WL 367545 at *2 (E.D.Pa. 2009) (citing *Petition of Sullivan.*, 904 F.2d 826, 845 (3d. Cir. 1990)).  The Sixth Circuit reached a similar conclusion when it restated the following:

> "The ultimate question in cases of this kind is not as to the exact causation of a disabling impairment.  The ultimate questions are (1) does plaintiff have a medically determinable physical or mental impairment, etc., and (2) if so, does it render him unable to engage in any substantial gainful activity?  For example, take the case of the individual who suffers from sheer physical weakness which makes it impossible to work; one doctor says he has chronic coronary insufficiency, while another thinks his problem is emphysema.  What difference?  The Act concerns itself with results, not exact causes."  *Walker v. Gardner*, 266 F.Supp. 998, 1002 (D.C.Ind. 1967), cited with approval by *Branham v. Gardner*, 383 F.2d 614 (6th Cir. 1967).

*Combs v. Gardner*, 382 F.2d 949, 956 (6th Cir. 1967); *see Simons v. Barnhart*, 114 Fed. Appx. 727, 733-734 (6th Cir. 2004).  In step four, the ALJ assessed the severity of all of Plaintiff's mental

16

limitations using the listing criteria for 12.04 affective disorders, which includes depression. A 12.04B analysis evaluates the degree of functional limitation in the following areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. The same exact functional limitations are used to assess the severity of a 12.08 personality disorder, and a 12.09 substance abuse disorder. 20 C.F.R. Pt. 404, Subpt. P., App. 1 §§§12.04, 12.08, 12.09. Because the ALJ evaluated the functional limitations associated with all of Plaintiff's mental impairments by using the 12.04B criteria at step four of the analysis, it ultimately is of little consequence that the ALJ did not characterize Plaintiff's depression and personality disorder as severe. Plaintiff's argument fails, therefore, because the ALJ's decision suggests she did consider Plaintiff's depression and personality disorder and evaluated the functional limitations caused by all of Plaintiff's mental impairments. Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

### B. Whether the ALJ Properly Weighed the Opinions of Examining and Non-Examining Physicians

Plaintiff argues the ALJ erred in rejecting the conclusions in the form opinion of examining physician Dr. Schonberg by erroneously reasoning that because Plaintiff's limitations were only expected to last between 30 days and 9 months, the limitations did not fit the definition for disability. Plaintiff suggests that his symptoms, including sleep problems, anxiety attacks, difficulty with attention and concentration, and violent feelings, clearly have lasted beyond twelve months because he has complained about them throughout the record, as documented in the medical evidence (Tr. 224-225, 229, 232, 234-237, 236, 240-241).

The ALJ did not err because the Social Security Act unambiguously includes a requirement

in the definition of "disability" that an impairment "last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§404.1505, 416.905. The Supreme Court held that "where the 'inability' did not last 12 months - the Agency will automatically assume that the Plaintiff failed to meet the duration requirement." *Barnhart v. Walton*, 535 U.S. 212, 215 (2002). Here, Dr. Schonberg concluded in a form that Plaintiff's limitations were expected to last "between 30 days and 9 months" (Tr. 194). Because the form itself indicates that Plaintiff's "inability" was not expected to last 12 months, Plaintiff "failed to meet the duration requirement" even under the terms of that form. *See Barnhart*, 535 U.S. 212 at 215. Therefore, the ALJ acted within her authority when she discounted the findings in Dr. Schonberg's form opinion because they were inconsistent with the definition of "disability."

As noted above, Plaintiff claims that the limitations set forth in Dr. Schonberg's form did in fact last beyond twelve continuous months, as documented in subsequent medical evaluations. Plaintiff relies on his own subjective symptoms, which were previously stated at the beginning of this section, as evidence of continuous limitations. Subjective complaints support a finding of disability when there is also objective medical evidence of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003); *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986). The ALJ is not required, however, to accept Plaintiff's subjective claims when the Plaintiff is not fully credible. *Jones*, 336 F.3d at 476; *see Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Kirk v. Secretary of Health & Human Servs*, 667 F.2d 524, 538 (6th Cir. 1981). The ALJ determined that Plaintiff was not fully credible because the objective medical evidence did not support a finding that Plaintiff's mental

limitations precluded Plaintiff from all types of work (Tr. 33, 37)[3].  Dr. Patel's evaluation and Dr. Swarn's multiple evaluations, including notes by Dr. Swarn that there was "no evidence of panic attacks," and statements by Plaintiff that he was "doing well,"   support a finding that Plaintiff's limitations did not last twelve continuous months(Tr. 218-219, 224, 228, 230, 232, 236, 238, 240). Therefore, the ALJ was not required to accept Plaintiff's subjective symptoms as evidence of limitations lasting beyond twelve months.

Plaintiff also appears to suggest that the conclusions contained within Dr. Schonberg's opinion were erroneously rejected because Dr. Schonberg was an examining physician.  Specifically, Plaintiff states that "where the expert medical opinions expressed by doctors who have examined and treated an applicant state that he is disabled, if such opinions are not controverted by substantial evidence to the contrary, the contrary decision of the Commissioner must be set aside" and appears to suggest that this statement should apply to Dr. Schonberg. (Doc. 17, at 15).  The Court finds, however, that the ALJ did not err in discounting Dr. Schonberg's form to the extent that she did so because Dr. Schonberg was not a treating physician, and the ALJ adequately explained her reasons for discounting the opinion.  Generally, treating physicians' opinions are granted "controlling weight."  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007); 20 C.F.R. §404.1527(d)(2).  "A treating source, accorded the most deference by the SSA, has not only examined the claimant but also has an 'ongoing treatment relationship' with her consistent with accepted medical practice."  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting 20 C.F.R. §404.1502).  Dr. Schonberg examined Plaintiff one time, at the request of the Bureau of Disability, and did not administer any treatment (Tr. 187, 190).  At best, Dr. Schonberg

---

[3]Plaintiff does not challenge the ALJ's determination of credibility.

is a "nontreating source" who examined Plaintiff but does not have, or did not have, an ongoing treatment relationship with Plaintiff. 20 C.F.R. §404.1502. Additionally, although the ALJ may not ignore the opinion and findings made by a state agency psychologist like Dr. Schonberg and must explain the weight given to those opinions and findings, she is not bound by them. SSR 96-6P. Here, the ALJ adequately explained that she disfavored conclusions made in Dr. Schonberg's form opinion because the time period of the limitations was inconsistent with the definition of "disability," the form was inconsistent with Dr. Schonberg's narrative opinion, and Dr. Schonberg's term "unemployable" was too broad to use in determining Plaintiff's RFC (Tr. 32). Therefore, the ALJ did not err because she did not have to give controlling weight to Dr. Schonberg's opinion, as Plaintiff suggests, since Dr. Schonberg was not a treating physician, and the ALJ thoroughly explained why she discounted the opinion.

### C.  Whether the ALJ Addressed the Record as a Whole

The ALJ recognized limitations found in Dr. Schonberg's narrative opinion by including in Plaintiff's RFC assessment the ability to "carry out simple, routine, and repetitive tasks,...that do not involve more than superficial contact with supervisors, coworkers, and the public" (Tr. 31, 38). Plaintiff argues the ALJ's assessment is erroneous as it is inconsistent with the sentence in Dr. Schonberg's opinion stating Plaintiff would be "labile, inconsistent, and demonstrate poor attendance and a low level of motivation" (Tr. 191). Plaintiff believes this portion of Dr. Schonberg's opinion is consistent with the mental functional capacity assessment in which Dr. Schonberg noted many "markedly" limited areas of functioning (Tr. 193). In addition, Plaintiff asserts that the ALJ failed to consider Dr. Melvin's finding of "moderately" limited areas, including the ability to maintain regular attendance, and the VE testimony that an inability to maintain regular attendance alone

20

prevents employment.  The Court, however, finds the ALJ did not fail to address the record as a whole as the ALJ did consider Dr. Schonberg's opinion and the VE's interpretation of Dr. Melvin's narrative opinion by including in the RFC "tasks which do not involve high production quotas and/or strict time deadlines" (Tr. 31, 38).

The ALJ is not required to address every piece of evidence included in the record as long as "there is evidence that the ALJ considered the evidence in question." *Carrol v. Barnhart*, 291 F.Supp.2d 783, 798 (N.D.Ill. 2003).  Indeed, the Court is well aware that:

> While it might be ideal for an ALJ to articulate his reasons for crediting and discrediting each medical opinion, it is well settled that:
>
>> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Even though the ALJ did not explicitly address Dr. Schonberg's conclusion that Plaintiff would be "labile, inconsistent, and demonstrate poor attendance and a low level of motivation," it does not amount to a failure to address the record as a whole because the ALJ was not required to mention every sentence in the record.  In addition, an RFC including jobs that allow for flexible deadlines and jobs which do not require consistent or high quotas accounts for Dr. Schonberg's finding of inconsistent work habits combined with a low level of motivation.  Furthermore, the evidence in the record does not suggest Plaintiff had problems maintaining attendance at his scheduled appointments.  He consistently attended his own doctor appointments (Tr. 252), drug testing appointments (Tr. 230, 265), and

21

worked with Children's Services sufficiently enough to gain custody of his children (Tr. 224, 230, 232).  In addition, when the ALJ asked the VE to consider the narrative opinion of Dr. Schonberg, the VE opined that Plaintiff would be able to perform some of his past work (Tr. 296).  Therefore, the ALJ did not err by failing to specifically address one sentence from Dr. Schonberg's opinion.

The ALJ also did not err by failing to address the VE's statement that Plaintiff would be unable to work based on Dr. Melvin's conclusion that Plaintiff would be "moderately" limited in his ability to maintain regular attendance because the VE's interpretation of Dr. Melvin's finding was not based on Dr. Melvin's actual RFC assessment.  Dr. Melvin reviewed Dr. Schonberg's findings using Section I of Form SSA-4734-F4-SUP which is "merely a worksheet...and does not constitute the RFC assessment."  SSA-POMS: DI 24510.060.  Section III is the narrative opinion where "the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I."  *Id.*

Generally, a VE forms an opinion of whether or not a claimant is able to work based on the claimant's RFC, age, education, and work experience.  20 C.F.R. §416.920(a)(4)(v).  An ALJ can rely on VE testimony regarding a claimant's ability to work when the hypothetical question posed accurately reflects the claimant's impairments.  *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632 (6th Cir. 2004) (citing *Varley v. Secretary of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Here, the VE formed an opinion that Plaintiff was unemployable based on Dr. Melvin's worksheet rather than his RFC assessment.  When the VE considered only Dr. Melvin's section III narrative opinion, however, he stated that Plaintiff could do some of his past work (Tr. 299).  As the hypothetical posed based on Dr. Melvin's section III narrative opinion was supported by substantial evidence and accurately reflected Plaintiff's impairments, the ALJ could rely on the VE's testimony that Plaintiff could do some of his past work.  Therefore, the ALJ did not fail to address the record

22

as a whole as she was not required to address every piece of evidence and the VE opined that Plaintiff could do some of his past relevant work based upon a hypothetical which accurately reflected Plaintiff's impairments.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: July 9, 2009.